UNITED COUNTRY REAL ESTATE, LLC,

     Plaintiff,

v.

UNITED REALTY GROUP, INC.,

     Defendant.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**THIS CAUSE** is before the Court following a four-day bench trial that began on May 8, 2017 and ended on May 15, 2017. Pursuant to this Court's Order, ECF No. [138], the parties submitted proposed findings of fact and conclusions of law following the filing of the trial transcripts. *See* ECF No. [149] (Defendant's Proposed Findings of Fact and Conclusions of Law); ECF No. [150] (Plaintiff's Proposed Findings of Fact and Conclusions of Law). The Court has carefully considered the evidence presented at trial, the applicable law, and the parties' submissions. Set forth below are the Court's relevant findings of fact and conclusions of law.

## I.  INTRODUCTION

Plaintiff United Country Real Estate, LLC ("Plaintiff" or "United Country") and Defendant United Realty Group, Inc. ("Defendant" or "URG") are both real estate companies that do business in Florida. United Country filed this lawsuit on January 26, 2016, alleging that URG is infringing on two federal trademark registrations United Country holds for the word "UNITED." United Country maintains that URG's advertisement of real estate brokerage services to prospective real estate agents using its UNITED REALTY GROUP mark is likely to

cause confusion with United Country's advertisement of real estate brokerage services to prospective real estate agents and brokers using the UNITED mark. United Country asserts two counts of trademark infringement in violation of the Lanham Act—one under 15 U.S.C. § 1114 (Count I) and another under 15 U.S.C. § 1125(a) (Count II)—for which it seeks declaratory and injunctive relief, disgorgement of URG's profits, and an award of attorneys' fees and costs. Defendant URG maintains that United Country has failed to establish the requisite likelihood of confusion between the marks at issue, and that, in any event, United Country's claims are barred by URG's assertion of the affirmative defense of laches.

## II.    FINDINGS OF FACT

### A.  United Country's History and Current Corporate Structure

United Country is a limited liability company that exists under the laws of Delaware, is headquartered in Missouri, and has offices nationwide. United Country's predecessor-in-interest was founded in 1925 as United Farm Agency. In 1987, United National Real Estate, Inc. purchased the trademark assets and goodwill of United Farm Agency. The trademarks and goodwill were acquired by First Horizon Corporation, which later changed its name to United Country Real Estate, Inc. Five D, Inc. acquired all the stock of United Country Real Estate, Inc., and in 2015, transferred all of its assets to a newly formed entity, Five D I, LLC ("Five D I"). Also in 2015, United Country Real Estate, Inc. transferred all of its assets—including trademarks and goodwill—to newly-formed United Country (i.e., Plaintiff). Currently, Five D I is the sole member of United Country.

### B.  The Two Trademarks at Issue and their Use by United Country and its Affiliates

United Country owns U.S. Trademark Registration Number 1,109,683 (the "'683 Registration") for the standard character UNITED word mark issued on December 19, 1978 in

connection with real estate brokerage services. United Country also owns U.S. Trademark Registration Number 3,063,245 (the "'245 Registration") for the standard character UNITED word mark, which was filed on March 1, 2005 and issued on February 28, 2006, in connection with franchisee services, namely offering technical assistance in the establishment and/or operation of real estate brokerages. Both the '683 Registration and the '245 Registration for UNITED (collectively, the "UNITED marks") are valid, subsisting, and incontestable. United Country owns all right, title, and interest in the '683 Registration and the '245 Registration for the UNITED marks. The UNITED mark is incorporated by United Country's logo, which appears as follows:



Further, the United States Patent and Trademark Office ("PTO") has accepted United Country's declarations of use for UNITED as a standalone mark since 1978, when the '683 Registration issued.

United Country and its affiliates, including Five D I as a non-exclusive licensee (d/b/a "United Real Estate"), provide real estate brokerage services under two brands. United Country's services focus on country and vacation properties, whereas United Real Estate's services—central to this lawsuit—focus on urban, residential properties. With respect to the United Real Estate brand, United Real Estate has a non-exclusive license from United Country to use the UNITED Marks, with a right to sublicense the UNITED Marks in connection with the advertising, promoting, and rendering the services recited in the '683 Registration and the '245 Registration. United Real Estate in turn sublicenses the rights to use the UNITED marks to its

franchisees. The UNITED mark is also incorporated by United Real Estate's logo, which appears as follows:



United Country and its affiliates, including United Real Estate, use the UNITED marks in commerce. As examples, United Country uses the UNITED marks—either in stylized or basic text form—in its publicly available franchise disclosure documents, on its websites, and in its advertisements to prospective brokers and agents. *See* Plaintiff's Exhibits ("Pl. Exhs.") 35-36, 40-41, 44-48.

Further, United Country offered evidence reflecting its efforts to enforce its rights under the UNITED marks against third parties. That evidence related to cease and desist letters to third parties, settlement agreements whereby third parties agreed to rebrand, judgments from five U.S. District Courts that enjoined third party defendants from using marks that are similar to the UNITED marks, and proceedings in the PTO whereby United Country opposed a mark or sought to cancel a registration that it perceived as likely to cause confusion. *See* Pl. Exhs. 68, 69A-72A, 73-75, 76A-77A, 78, 79A, 80-85, 88, 94A-95A, 96A.

**C. United Real Estate**

United Real Estate began marketing its real estate brokerage services in the Florida market in 2013. The first of United Real Estate's franchises for the urban market in Miami opened as operational in August of 2016 by franchisee International Gateway Realty Corporation, owned by Elizabeth Diaz de Villegas. At the time of trial, the United Real Estate

brand had four franchises in Florida: two in Miami, one in Fort Meyers, and one outside of Orlando.[1] The real estate brokerage services provided by United Real Estate under the UNITED marks include recruiting brokers to start a United Real Estate franchise, recruiting real estate agents to join United Real Estate franchises and assisting broker-owners in their recruitment of agents, and providing resources to both brokers and agents to assist in advertising, marketing, and ultimately closing transactions for buyers and sellers. At trial, Peter Giese, the President of United Real Estate, testified that the cost for purchasing a new United Real Estate franchise can range from approximately $54,000 to $360,000 and that the process, which includes the execution of a lengthy franchise agreement, typically takes between 30 and 60 days. With respect to agent compensation, United Real Estate utilizes a 100% commission model with a flat transaction fee.

Of particular importance in this case is United Real Estate's recruitment of brokers and agents. United Real Estate primarily recruits prospective franchisees (i.e., brokers) through targeted emailed marketing pieces, as well as through its broker-facing websites. United Real Estate also assists franchisees in the recruitment of agents through marketing done for individual franchises as well as through setting up agent-facing websites for each franchise to recruit agents. The marketing pieces are mass emailed to brokers and agents, and usually contain a link to one of United Real Estate's websites, where prospective brokers or agents can fill out a form to learn more about United Real Estate's offerings. If a broker receives a marketing piece and requests additional information, United Real Estate follows up directly on the lead. If an agent receives a marketing piece and requests additional information, United Real Estate forwards that submission to the nearest United Real Estate franchise so the broker of that franchise can follow up on possible recruitment of the agent. As an example, Ms. Diaz de Villegas testified that after

---

[1] In total, United Real Estate has 66 franchise territories throughout the United States.

becoming a franchisee, United Real Estate provided her referrals for prospective agents and set up a recruitment website for prospective agents to join her office.

In addition to the above mentioned recruitment efforts, United Real Estate has advertised in Florida Realtor Magazine and other print media, on social media platforms, and on third-party websites. The extent of United Country's advertisement—including that for United Real Estate—has been substantial, ranging from approximately $6 million to $10 million annually over the previous nine years.

### D. United Realty Group

Defendant URG is a family-managed corporation that exists under the laws of Florida. Defendant URG was incorporated in 2002 and obtained its license as a real estate company on July 18, 2005. After obtaining its license, URG subsequently began providing real estate brokerage services under the trade name "United Realty Group." Defendant URG operates primarily in southern Florida and Orlando, with a total of 18 offices located throughout the Miami-Dade, Broward, and Palm Beach Counties, and Orlando. Defendant URG has two qualified brokers and, at the time of trial, approximately 2,000 real estate agents who assist individuals seeking to buy, sell, or rent property in primarily urban areas. Defendant URG uses the UNITED REALTY GROUP mark in logo form:



and in basic text form—separate and apart from its logo—on its website, signage, and advertisements to agents. *See* Defendant's Exhibits ("Def. Exhs.") 6, 30, 114; Pl Exhs. 52, 56, 62-63.

Defendant URG does not sell franchises and does not recruit real estate brokers, but instead targets only agents. Like United Real Estate, URG offers prospective agents a 100% commission model with a flat transaction fee. Defendant URG advertises to prospective agents in select regions of Florida—a list of which is provided to URG by a third-party vendor—through marketing pieces that are mass emailed to agents. The emails typically display the UNITED REALTY GROUP mark, either in text or logo form, and inform the targeted agents of URG's compensation model. In addition, URG, like United Real Estate, has advertised in Florida Realtor Magazine. The majority of URG's agent referrals, however, result from word of mouth, as is reflected by URG's relatively modest advertising costs; over the past five years, URG spent approximately $60,000 annually on advertising, which includes the salary for its recruiting director. Finally, before becoming associated with URG, a prospective agent must usually go through an in-person or verbal interview process with URG's recruiting director or another member of the company and must fill out paperwork.

At trial, principals and employees of URG testified that URG recruits only "seasoned" agents, although no uniform standard was presented for what qualifications or experience would be required of a prospective agent to be considered "seasoned" by URG. *See, e.g.*, ECF No. [146] at 134-39, 195-96; ECF No. [147] at 67-71, 115-16, 134-35, 170-71. Michael Brownell, URG's Vice President and one of its two licensed brokers, confirmed that URG's advertisements are sent to all agents in a targeted region based on the agent list provided by the third-party vendor, and that URG has no control over the type of agent its advertisements are sent to. *See* ECF No. [147] at 174-75. Also, URG's recruiting director testified that it is possible that URG has hired over 100 agents with less than one year of experience. *See* ECF No. [148] at 67-71.

### E. The Instant Trademark Dispute

On July 11, 2014, United Real Estate sent an initial cease and desist letter to URG, alleging that URG's use of the mark UNITED in connection with services similar to United Real Estate's services constituted infringement on the UNITED marks, and therefore demanding that URG cease and desist from such further use of the mark UNITED. Prior to receiving the July 11, 2014 cease and desist letter, URG had never heard of United Real Estate. United Real Estate sent a follow-up cease and desist letter to URG on August 14, 2014. Following URG's receipt of the second cease and desist letter, David Chambless, a co-owner of URG, called and spoke with Jessica Barnard, the signatory on the cease and desist letters. Ultimately, URG did not comply with United Real Estate's requests, and this lawsuit commenced on January 26, 2016.

### i. Potential Confusion Related to the UNITED Marks

United Country presented evidence of four specific instances—each instance relating to interactions between United Real Estate and unrelated individuals—which United Country argues amounts to actual consumer confusion as to whether United Real Estate and URG are affiliated. First, Mr. Giese testified that in June of 2014—before United Real Estate had any offices or franchises in Florida—he spoke on a panel at a national real estate conference about new business models in the real estate industry, such as United Real Estate's 100% commission model. Following the panel discussion, Mr. Giese was approached by Christine Hansen, a fellow panelist and the broker/owner of Century 21 Hansen Realty in Fort Lauderdale, Florida. On the witness stand, Mr. Giese recalled that Ms. Hansen had indicated to him her belief that United Real Estate already had a presence in Florida, which of course was not the case. Mr. Giese believed that Ms. Hansen must have been referring to URG. When called as an impeachment witness, Ms. Hansen testified that she could not recall whether or not she spoke to Mr. Giese at

the June 2014 conference. All that Ms. Hansen could recall is that she had a conversation with one of the panel members, and that during that conversation she stated either: "You guys are in Florida" or "Aren't you guys in Florida?" ECF No. [146] at 140. Ms. Hansen also testified that she did not specifically refer to URG during the conversation, *id.* at 137, but she did confirm that she has known Mr. Chambless (one of URG's owners) in a professional context for approximately fifteen years and that her most recent real estate business dealing with Mr. Chambless was in 2013, *see id.* at 144-46.

Second, Mr. Giese testified that in July of 2016 he received a form submitted through one of United Real Estate's websites from an individual identifying himself as Clay Hyslop. The text in the "message field" of the form indicated that Mr. Hyslop was interested in "joining as an agent," that he had been a "realtor in Florida since 2005," that he was considering moving his license from his current broker, and that he recalled "seeing United Realty's adverts and attractive commission schedule." Pl. Exh. 51. Mr. Giese forwarded the form submission to United Country's CEO and legal department the same day he received it, stating: "Confusion with us and United Realty in Florida. We haven't started marketing our commission schedule in Florida yet, just our franchise opportunity." *Id.* Mr. Giese testified that at that time, no United Real Estate offices were open in Florida, and also that United Real Estate's 100% commission model would not have been advertised until an office opened and United Real Estate and a franchisee were actively recruiting agents.

Third, Ms. Diaz de Villegas testified that she received an email marketing piece from URG in July of 2013 that advertised URG's "100% commission" and "$299 Transaction Fee" model, and that she saved the email in her folder consisting of advertisements from other realtors. Ms. Diaz de Villegas forwarded that email to Orlando Pedrero, United Real Estate's

Executive Vice President of Franchise Development, more than two years later in August of 2015—when franchise negotiations between her and United Real Estate began to intensify. The text of Ms. Diaz de Villegas' email to Mr. Pedrero reads: "I'm confused? These people are advertising like crazy ! Is this you?" Pl. Exh. P052. Ms. Diaz de Villegas testified that although she had previously been made aware that United Real Estate and URG are two separate entities, she was still confused as to whether there was an affiliation because of the URG marketing email, particularly given the shared use of "United" in the company names and that both companies utilize a 100% commission model. Ms. Diaz de Villegas further testified that she reached out to Mr. Pedrero because she did not want to be affiliated with URG.

Fourth, Mr. Pedrero received reports in early 2016 from his sales director in south Florida in which the sales director expressed his perception that certain prospective franchisees that he had spoken with were confused as to United Real Estate and "the locally based real estate company with a similar name." Pl. Exh. 53.

### ii. Third Party Use of "United" in Florida's Real Estate Brokerage Field

Defendant URG presented evidence in the form of printouts from the Florida Department of Business and Professional Regulation's ("DBPR") website demonstrating that at least 45 other businesses in Florida use the word "United" in their company name and have a license from the state of Florida to provide real estate services. The DBPR records establish that the listed businesses are smaller in size compared to United Real Estate and URG, as none of them have more than 26 agents and brokers. To show that these 45 businesses were operational and actively conducting business in Florida's real estate brokerage field, URG introduced: testimony by its principals and employees who personally visited several of the identified businesses' locations; licensing records from the DBPR demonstrating active brokerage licenses and licensed

real estate agents; evidence of active real estate listings from the Multiple Listing Service ("MLS"), which is the trade directory used to list properties for sale or rent; directory listings for many of the identified businesses in the Florida Yellow Pages listings; and screenshots of many of the identified businesses' websites.[2]

Finally, URG offered Dr. Wayne D. Hoyer, Ph.D., as an expert witness, who testified that widespread third-party usage of the word "United" in various industries makes the UNITED marks at issue weak. Dr. Hoyer elaborated that when a word mark—especially one that is a common word such as "United"—is used by many different businesses, it is more difficult to build within the minds of consumers a strong brand association with that mark. It is therefore unlikely, in Dr. Hoyer's opinion, that consumers will draw an association between either the UNITED mark and United Country, or between United Country and URG. Dr. Hoyer testified that he based his opinion as to the widespread third-party usage of the word "United" on a Google internet search he performed prior to trial, which revealed a number of websites owned by businesses with "United" in their company name.[3]

---

[2] Defendant URG also introduced evidence in the form of website printouts of at least 100 other businesses in the real estate industry throughout the United States that use the word "United" in their company name. Additionally, URG offered certified copies of 32 different trademarks granted by the PTO that include the word "United," several of which belong to businesses that provide some form of real estate services.

[3] Previously, the Court found that the methodology originally employed by Dr. Hoyer—which involved his reviewing of a Thompson Search Report and counting the number of times "United" appeared therein—was inadequate and did not rise to the "same level of intellectual rigor that would have accompanied such an analysis had it been conducted outside the litigation context under normal time constraints." ECF No. [92] (granting in part United Country's Motion to Strike). On that basis, the Court precluded Dr. Hoyer from offering at trial any opinions that he formed based on the Thompson Search Report. *Id.* at 15-16.

### III.  CONCLUSIONS OF LAW

#### A.  United Country is the Proper Plaintiff

As a preliminary matter, use of the UNITED marks by United Real Estate—as a non-exclusive licensee and the sole member of United Country—as well as by United Real Estate's sub-licensees, inures to the benefit of United Country—the owner of the UNITED Marks.  *See* 15 U.S.C. § 1055.  Such use of the UNITED marks therefore constitutes use by United Country, and United Country as the owner of the UNITED marks is the proper party and the only party with rights to sue for enforcement of rights under the Lanham Act.  *See generally Geltech Solutions, Inc. v. Marteal, Ltd.*, 2010 WL 1791423, at *3 (S.D. Fla. May 5, 2010) ("In order to bring a trademark infringement suit under 15 U.S.C. § 1114, the plaintiff *must be a 'registrant,'* a term that only encompasses the trademark registrant and its 'legal representatives, predecessors, successors and assigns.'") (quoting 15 U.S.C. § 1127) (emphasis added).

#### B.  Trademark Infringement under 15 U.S.C. §§ 1114(1)(a), 1125(a)

A defendant is liable for trademark infringement under the Lanham Act if it, without consent, "uses 'in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark' that 'is likely to cause confusion, or to cause mistake, or to deceive.'" *Fla. Int'l U. Bd. of Trustees v. Fla. Nat'l U., Inc.*, 830 F.3d 1242, 1255 (11th Cir. 2016) (quoting 15 U.S.C. § 1114(1)).  In order to prevail on a claim for trademark infringement under either 15 U.S.C. §§ 1114 or 1125 (unfair competition), a plaintiff must demonstrate (1) that its mark has priority and (2) that the defendant's mark is likely to cause consumer confusion.  *See id.* (citing *Frehling Enters., Inc. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999)); *Babbit Elec., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1181 (11th Cir. 1994) (stating that the analysis under § 1125 is the same as under § 1114).

## IV.    ANALYSIS

### A.  Priority

United Country's '683 Registration constitutes constructive use and notice of the UNITED mark, conferring a nationwide priority since December 19, 1978 over any rights that any third party may assert in or to United Country's UNITED mark and/or confusingly similar variations thereof.[4]  *See* 15 U.S.C. §§ 1057(c), 1072.   United Country's '245 Registration constitutes constructive use and notice of the UNITED mark, conferring a nationwide priority since March 1, 2005 over any rights that any third party may assert in or to United Country's UNITED mark and/or confusingly similar variations thereof.  *See id.*   The Court finds that United Country's UNITED marks have priority over URG's UNITED REALTY GROUP mark, as neither URG nor any of its predecessors or affiliates began providing real estate brokerage services under the UNITED REALTY GROUP mark until after URG obtained its license as a real estate company on July 18, 2005—after nationwide priority of the '683 Registration and the '245 Registration was conferred.[5]

### B.  Likelihood of Confusion

The Court considers seven factors in assessing whether or not a likelihood of consumer confusion exists: (1) the strength of the allegedly infringed mark; (2) the similarity of the infringed and infringing marks; (3) the similarity of the goods and/or services the marks represent; (4) the similarity of the parties' trade channels and customers; (5) the similarity of advertising media used by the parties; (6) the alleged infringer's intent in using the infringing

---

[4] For trademark registrations that matured from applications filed before November 16, 1989, constructive nationwide priority is effective as of the registration date.  By contrast, for trademark registrations that matured from applications filed on or after November 16, 1989, constructive nationwide priority is effective as of the application filing date.  *See* Trademark Law Revision Act of 1988, Pub. L. 100-667, § 128(b)(1), 102 Stat. 3944.

[5] The Court notes that URG did not challenge the priority of either the '683 Registration or the '245 Registration in its proposed findings of fact and conclusions of law.  *See* ECF No. [149].

mark; and (7) the existence and extent of actual confusion in the consuming public. *Fla. Int'l U. Bd. of Trustees*, 830 F.3d at 1255 (citing *Tana v. Dantanna's*, 611 F.3d 767, 774-75 (11th Cir. 2010)). Of these factors, the strength (or type) of mark at issue and the evidence of actual confusion "are the most important." *Id.* These factors, however, do not constitute an exhaustive list, and courts in this Circuit may consider additional factors where appropriate. *See Tana*, 611 F.3d at 780.

The Eleventh Circuit has instructed that, in analyzing the above mentioned factors, special attention might need to be paid to the level of sophistication of the relevant consumer base. More specifically, courts in this Circuit must recognize that "sophisticated consumers of complex goods or services . . . are less likely to be confused than casual purchasers of small items." *Fla. Int'l U. Bd. of Trustees*, 830 F.3d at 1256 (quoting *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1361 (11th Cir. 2007)) (alterations omitted); *see also Freedom Sav. & Loan Ass'n v. Way*, 757 F.2d 1176, 1185 (11th Cir. 1985) ("The sophistication of a buyer certainly bears on the possibility that he or she will become confused by similar marks."); 4 McCarthy on Trademarks and Unfair Competition [hereinafter "McCarthy"], § 23:101 (4th ed. 2016) ("Where the relevant buyer class is composed solely of professional or commercial purchasers, it is reasonable to set a higher standard of care than exists for consumers. Where the relevant buyer class is composed only of professionals or commercial buyers familiar with the field, they are usually knowledgeable enough to be less likely to be confused by trademarks that are similar. Such professional buyers are less likely to be confused than the ordinary consumer."). For example, in *Fla. Int'l U. Bd. of Trustees*, the Eleventh Circuit agreed with the district court's "recogni[tion] that students looking for a college to attend are likely to be relatively sophisticated and knowledgeable because of the nature, importance, and size of the investment in a college

education." 830 F.3d at 1256. In finding reasonable the district court's conclusion that a Florida university's adoption of a new name and acronym did not and would not likely cause consumer confusion with another Florida university's name and acronym, the Eleventh Circuit emphasized that the "burden of establishing a likelihood of confusion was higher than usual . . . because, we repeat, potential college students are relatively sophisticated consumers who are unlikely to be easily or meaningfully confused by similar-sounding university names." *Id.* at 1265.

The heightened standard applied in *Fla. Int'l U. Bd. of Trustees* is likewise applicable in this case. The relevant consumer base here—i.e., real estate agents—is at the very least relatively sophisticated.[6] This is so because, as demonstrated at trial, real estate agents are educated, licensed professionals. An individual who aspires to become a licensed real estate agent in Florida must complete 60 hours of training for a pre-license class, pass a license examination, and then pass a state-sponsored examination. After becoming licensed by the Florida DBPR, a real estate agent must continue to participate in a certain number of educational courses every two years. Moreover, not unlike potential college students—whose important decision to invest in a college education speaks to their level of sophistication and knowledge, *see Fla. Int'l U. Bd. of Trustees*, 830 F.3d at 1256—real estate agents who might be exposed to, or otherwise seek out, the recruitment efforts of a particular real estate brokerage company face an important decision. They must consider for whom it is that they will work for or represent, and essentially the means by which they will make a living. The "nature, importance, and size"

---

[6] To be sure, United Country has based the theory of its case solely on real estate agents—not real estate brokers and not potential buyers, sellers, or renters of property. *See, e.g.*, ECF No. [150] at 6-7 ("Defendant offers directly competing real estate brokerage services with United Real Estate . . . to an overlapping consumer base. Namely, the *core consumer* for Defendant and United Real Estate are *agents* who enjoy a 100% commission and flat transaction fee model.) (emphasis added); *see also id.* at 35 ("Defendant argues there is no overlap because it alleges United [Country] only targets prospective brokers (as prospective franchisees), and that Defendant only targets prospective agents. However, . . . while [United Country] does recruit brokers to set up franchises under the UNITED® Marks, those broker owners then in turn recruit agents under their particular United franchise.") (emphasis in original).

of such a decision also bears on the sophistication and knowledge of the relevant real estate agent consumer base in this case. *Id.*

Another related consideration bears mention. A real estate agent who is targeted by the recruitment efforts of a real estate brokerage company is not like the typical buyer or purchaser seen in the ordinary trademark case. Similarly, his or her decision to either join a particular real estate brokerage company or not is not like the typical transaction seen in the ordinary trademark case. To put it simply, recruited real estate agents do not necessarily buy anything. Rather, down to its simplest form, the transaction contemplated in this case is really an employment decision.

Accordingly, in analyzing the relevant likelihood of confusion in this case, the Court will remain "mindful" of both the sophistication of real estate agents generally and the precise nature of the employment transaction underpinning United Country's claims against URG. *Id.*

### i. Strength of the UNITED Mark

The first factor to consider is the allegedly infringed mark's strength, which is "the second most important factor in the seven-factor balancing test. The stronger the mark, the greater the scope of protection accorded it[;] the weaker the mark, the less protection it receives." *Id.* at 1256 (citations and internal quotation marks omitted) (alteration in original). Assessment of the strength of a mark is to be done in two ways. For the first step, the factfinder should classify the mark as "generic," "descriptive," "suggestive," or "arbitrary" based on the relationship between the mark and the service or good it describes. *Id.* Generic marks are the weakest of the four categories, and they refer to a class of which an individual product is a member ("for example, 'liquor store' used in connection with the sale of liquor"). *Id.* Generic marks are not entitled to protection. *Id.* Descriptive marks describe a characteristic or quality of

an article or service ("for example, 'vision center' denoting a place where glasses are sold"). *Id.* Suggestive marks "subtly connote something about the service so that a customer could use his or her imagination and determine the nature of the service" ("such as 'penguin' being applied to refrigerators"). *Freedom Sav. & Loan*, 757 F.2d at 1182 n. 5; *Fla. Int'l U. Bd. of Trustees*, 830 F.3d at 1256. Finally, arbitrary marks are the strongest of the four categories, and they bear no relationship to the product ("e.g., 'Sun Bank' is arbitrary when applied to banking services"). *Fla. Int'l U. Bd. of Trustees*, 830 F.3d at 1256-57. Then, after categorizing the nature of the mark, for the second step the factfinder considers "the degree to which third parties make use of the mark." *Id.* at 1257 (quoting *Frehling Enters.*, 192 F.3d at 1336). "The less that third parties use the mark, the stronger it is, and the more protection it deserves." *Id.* (quoting *Frehling Enters.*, 192 F.3d at 1336).

Further, a mark's strength is enhanced if it has "incontestable" status, which means that the mark has been registered for five years with the PTO, its holder has filed an affidavit as required by 15 U.S.C. § 1065(3) with the PTO, and the PTO has accordingly declared the mark "incontestable." *Id.* "An incontestable mark is presumed to be at least descriptive with secondary meaning, and therefore a relatively strong mark." *Id.* (quoting *Sovereign Military Hospitaller Order of Saint John of Jerusalem of Rhodes & of Malta v. Fla. Priory of the Knights Hospitallers of the Sovereign Order of Saint John of Jerusalem, Knights of Malta, The Ecumenical Order*, 809 F.3d 1171, 1183 (11th Cir. 2015)). This presumption may of course be rebutted by evidence of extensive third-party use of the mark. *See Southern Grouts & Mortars, Inc. v. 3M Co.*, 2008 WL 4346798, at *16-17 (S.D. Fla. Sept. 17, 2008); *Carnival Corp. v. SeaEscape Casino Cruises, Inc.*, 74 F. Supp. 2d 1261, 1265-66 (S.D. Fla. 1999); *Michael Caruso and Co., Inc. v. Estefan Enters., Inc.*, 994 F. Supp. 1454, 1459-60 (S.D. Fla. 1998); *Armstrong*

*Cork Co. v. World Carpets, Inc.*, 597 F.2d 496, 505 (5th Cir. 1979). Here, the parties have stipulated that the UNITED marks have incontestable status. *See* ECF No. [125] at 6.

Because the UNITED marks are incontestable, they are presumed to be at least descriptive and relatively strong. *See Fla. Int'l U. Bd. of Trustees*, 830 F.3d at 1257. Moreover, from a conceptual perspective, because the word "United" bears no apparent relationship to real estate brokerage services, the UNITED marks are properly categorized as arbitrary; indeed, Dr. Hoyer—URG's own expert witness—testified that the word "United" does not describe real estate services. *See* ECF No. [148] at 24-25; *see also, e.g.*, *Sun Banks of Fla, Inc. v. Sun Fed. Savs. and Loan Ass'n*, 651 F.2d 311 (5th Cir. 1981) (categorizing "Sun Bank" as an arbitrary or fanciful mark when applied to banking services). Defendant URG nevertheless argues that the strength of the UNITED marks is diluted because (1) from a conceptual perspective, the use of the marks by United Country and its affiliates is geographically descriptive and the word "United" is a general and widely used term, and (2) from a commercial perspective, the field is crowded with similar real estate businesses located in Florida that use the word "United" in their company name. *See* ECF No. [149] at 29-32. The Court agrees with the latter argument.

With respect to the former, the Court disagrees with URG that the word "United" as used by United Country and its affiliates is geographically descriptive. *See generally Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 2009 WL 6812111, at *8 (S.D. Fla. Oct. 13, 2009) (explaining that geographically descriptive marks are "considered among the weakest marks and entitled to only a minimal level of protection"). Defendant URG asserts that "[t]he word United geographically describes a place, such as the United States, United Arab Emirates, and United Kingdom." ECF No. [149] at 29 (citing *Miller's Ale House*, 2009 WL 6812111, at *8; *HBP, Inc. v. Am. Marine Holdings, Inc.*, 290 F. Supp. 2d 1320, 1329 (M.D. Fla. 2003), *aff'd*

*sub nom. HBP, Inc. v. Am. Marine Holdings*, 129 F. App'x 601 (11th Cir. 2005)). But in this case, URG offers no support for the suggestion that United Country's relevant use of the UNITED marks has such a geographic nature. To the contrary, the UNITED REAL ESTATE mark used by United Real Estate has no geographic connotation to it whatsoever.[7] *Cf. Miller*, 2009 WL 6812111, at *8 (recognizing "Boynton" in the mark "Boynton Ale House" as a "local geographic identifier"); *HBP*, 290 F. Supp. 2d at 1329 ("The geographic origin and resulting widespread third-party use of 'Daytona' weighs against the strength of HBP's marks."). With respect to URG's contention that "United" is an otherwise generic and widely used term—indeed it is—the Eleventh Circuit has instructed that "the strength of a mark does not turn on its component words in a vacuum, but instead 'the *relationship* between the name and the service or good it describes.'" *Sovereign Military*, 809 F.3d at 1186 (quoting *Frehling Enters.*, 192 F.3d at 1335) (emphasis in original). "For example, 'apple' is a common word, but it is a strong mark when used in connection with personal computers. And 'sun' is a common word, but it is a strong mark when used in connection with banking." *Id.* (citing 2 McCarthy § 11:11; *Frehling Enters.*, 192 F.3d at 1335) (internal citation omitted). Looking at the relevant relationship between name and service in this case, URG has not convinced the Court that the word "United" is not conceptually a strong mark when used in connection with real estate brokerage services.

That said, URG has successfully shown that the UNITED marks have diminished commercial strength. Specifically, Defendant URG identified 45 licensed real estate businesses in Florida that use the word "United" in their company name—examples of which include First United Realty, Inc., Florida United Realty Corp., and United Realty Services, Inc. Relatively

---

[7] United Real Estate is the only entity affiliated with United Country that, like URG, offers real estate brokerage services in connection with urban, residential properties in Florida. For that reason, the Court considers United Country's claims with an attention only to United Real Estate's use of the UNITED marks, rather than United Country's own direct use of the marks.

speaking, 45 is a high number of third-party users. *See AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1539 (11th Cir. 1986) (affording lesser protection where 8 third party users in the same market employed similar trade dress); *El Chico, Inc. v. El Chico Café*, 214 F.2d 721, 725 (5th Cir. 1954) (finding 27 instances of third party use of "Chico," "El Chico," and similar names "for various products and articles" was sufficient to classify "El Chico" mark as weak); *Homes & Land Affiliates, LLC v. Homes & Loans Magazine, LLC*, 598 F. Supp. 2d 1248, 1261 (M.D. Fla. 2009) (finding "widespread third-party use" based on 18 instances); *see also Fla. Int'l U. Bd. of Trustees*, 830 F.3d at 1257-58 (finding that "[12] third-party uses can be sufficient to diminish the distinctiveness of a mark" after clarifying that "there is no hard-and-fast rule establishing a single number that suffices to weaken a mark" and so a court must consider "the entire name a third party uses, as well as the kind of business in which the user is engaged") (citation omitted). Naturally, then, in confronting URG's evidence of third-party use, United Country does not focus on the total number of third-party users, but instead argues that URG's evidence of third-party use warrants minimal if any weight because URG presented no evidence as to the *extent* of the use of the identified third parties' respective marks. *See* ECF No. [150] at 24-29. By contrast, United Country points to its "evidence regarding the amount of time, money, and efforts it expends in marketing, promoting, and advertising . . . under the UNITED® marks." *Id.* at 24.

As mentioned, from a financial perspective, United Country's marketing efforts has cost it between $6 million and $10 million annually over the previous nine years.[8] Interestingly, those figures dwarf URG's marketing costs, which, annually, have consisted primarily of its recruiting director's salary. United Country's reliance on its substantial marketing costs is not

---

[8] The Court notes, however, that the share of those costs specifically with respect to United Real Estate was never quantified.

misplaced, especially when viewed in comparison to URG's modest marketing costs by comparison. As explained by the Eleventh Circuit in *Fla. Int'l U. Bd. of Trustees*:

> The practical problem with FIU's argument [as to commercial strength] . . . is that FIU didn't offer any direct evidence of commercial strength. To be sure, FIU has spent substantial time, energy, and effort in promoting its mark, and has continually educated students over the past 50 years under the name FIU. The parties stipulated that FIU spends approximately $15 million annually on marketing and community outreach and engagement efforts, including advertising and promoting its mark through its athletic programs, radio advertisements, its website, and by publishing FIU Magazine. But, in isolation, evidence of promotion efforts is not sufficient to establish a mark's commercial strength because it tells us precious little about the efficacy of those efforts in creating marketplace recognition of FIU's mark. Absent comparative evidence establishing that FIU has spent substantially more on advertising than its competitors in the field of higher education, or "direct evidence of consumer recognition," 2 McCarthy § 11.83, FIU's promotional efforts do not establish that its mark has acquired "such distinctiveness that it can function as a significant indication of a particular" university among others in the same market. *John H. Harland* [*Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 974 n.13 (11th Cir. 1983)]. There simply was not sufficient evidence of commercial strength in the record to require the district court to ignore the substantial third-party usage.

830 F.3d at 1259 (emphasis in original). Here, where United Country has presented "no direct evidence of consumer recognition, such as by survey[,]" *id.* (quoting 2 McCarthy § 11.83), it is significant that United Country has presented "comparative evidence" with respect to its marketing costs. Aside from URG, United Country points out that the 45 other real estate businesses in Florida with "United" in their name all have a relatively small number of active agents—e.g., less than 26—which in turn United Country views as lending "the inference that those third parties are not very active." ECF No. [150] at 28. Although the Court does not necessarily adopt the inference that these smaller businesses are "not very active," the Court is

willing to accept the inference that these businesses do not spend nearly the amount of money on marketing that United Country does with respect to the UNITED marks.[9]

Nevertheless, the Court will not, as United Country urges it to, completely ignore the third-party usage in this case. *See Fla. Int'l U. Bd. of Trustees*, 830 F.3d at 1259. For one, United Country's comparative evidence of marketing costs must be qualified in at least one respect—namely, the evidence at trial reflected that, in Florida's real estate brokerage field, word of mouth can also serve as an effective avenue of recruitment (URG being a prime example). Further, and more importantly, that these other businesses might be smaller in size than United Country or URG—even substantially so—does not necessarily render their usage of the word "United" in Florida's real estate brokerage field inconsequential. This is especially so given the total number of third party users identified, that they are scattered throughout the state of Florida, and that there is evidence reflecting the active nature of many of them (such as websites, real estate listings, and operational office spaces). At least to some extent, then, these third party users have had some crowding effect on the field. *See, e.g.*, *Century 21 Real Estate LLC v. Century Ins. Grp.*, 2007 WL 484555, at *6 (D. Ariz. Feb. 8, 2007), *aff'd sub nom. Century 21 Real Estate LLC v. Century Sur. Co.*, 300 F. App'x 527 (9th Cir. 2008) ("Based on undisputed evidence showing substantial use of the term 'Century' in the real estate and insurance industries, the Court found no reasonable jury could conclude that the public would expect all companies with 'Century' in their names to be related to C21 [(Century 21)], or that all services using the name 'Century' emanate from a single source.").

---

[9] Without speculating as to the strength of the correlation, the Court simply observes that URG, as an example, employs an overwhelmingly larger number of real estate agents than do the identified third-party users and spends far less on marketing than does United Country.

On balance, though it is certainly a close call, the Court finds the UNITED marks to be relatively weak given the crowded field they occupy. The Court therefore finds that this factor weighs in favor of URG.

### ii. Similarity of the Marks

Next, the Court must compare the plaintiff's marks with the defendant's marks and measure their similarity. *Fla. Int'l U. Bd. of Trustees*, 830 F.3d at 1260. "The greater the similarity, the greater the likelihood of confusion." *Id.* The "key question" is "whether the marks are sufficiently similar 'to deceive the public.'" *Id.* (quoting *Saxlehner v. Eisner & Mendelson Co.*, 179 U.S. 19, 33 (1900)). Rather than simply comparing isolated features, the Court must consider the "overall impression created by the marks" by comparing "the appearance, sound and meaning of the marks, as well as the manner in which the marks are used." *Id.* (quoting *John H. Harland*, 711 F.2d at 975). "If a trademark operates in a crowded field of 'similar marks on similar goods or services,' slight differences in names may be meaningful because consumers 'will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other.'" *Id.* (quoting 2 McCarthy § 11:85).

Previously, the Court denied a motion for summary judgment filed by URG, and in doing so, observed that with respect to the similarity of the marks factor, "the parties [did] not seem to agree upon which marks are being infringed." ECF No. [90] at 12. Defendant URG focused primarily upon a comparison of the parties' logo marks, arguing that the differences in the wording and graphic designs weighed against a likelihood of confusion. *See id.* at 11-12. Throughout trial and following its conclusion, URG's focus has remained on the parties' logo marks and their purported dissimilarities. *See* ECF No. [149] at 32-33. The problem with this focus is that United Country's claims are based on potential confusion caused by URG's

UNITED REALTY GROUP mark as it is used in logo *or* textual form.[10]  United Country's position is best captured by the following statement: "[G]iven that UNITED is the dominant element of Defendant's mark when viewed *in any form*, consumers are likely to identify UNITED as the salient portion of Defendant's mark and thus mistakenly believe that Defendant is in some way affiliated with United [Country]."  ECF No. [150] at 33 (emphasis added).

Interestingly, however, in simply asserting "a likelihood of confusion between *its use* of the UNITED[] [m]arks and Defendant's use of UNITED REALTY GROUP[,]" ECF No. [150] at 30 (emphasis added), United Country has not identified which of its (or its affiliates') specific use or uses of the UNITED marks are likely to be confused when viewed in comparison to URG's mark.  United Country has not clarified, for example, whether it believes that URG's mark is confusingly similar to UNITED as used in UNITED COUNTRY REAL ESTATE or to UNITED as used in UNITED REAL ESTATE (or both).  United Country's broad focus on its "use" of the standalone UNITED mark is problematic, because the relevant context for assessing the similarity of the marks factor is precisely how the marks are encountered by consumers in the marketplace.  *See Zaletel v. Prisma Labs, Inc.*, 2017 WL 877302, at *4 (D. Del. Mar. 6, 2017) ("Because the test is likelihood of confusion by consumers in the marketplace, the degree of similarity of the marks is assessed by looking at the marks as encountered by consumers in the marketplace."); *Isle of Capri Casinos, Inc. v. Flynt*, 2016 WL 6495380, at *5 (C.D. Cal. Nov. 1, 2016) ("To address the similarity of the marks, a court considers the "sight, sound, and meaning" of the marks, taking into consideration how the marks are encountered in the marketplace."); *You*

---

[10] United Country owns registrations for UNITED in "standard characters," meaning that United Country is entitled to federal trademark protection for "all depictions" of the marks, "regardless of the font style, size, or color, and not merely 'reasonable manners' of depicting" the marks.  Trademark Manual of Examining Procedure § 1207.01(c)(iii); *see also Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 950 (Fed. Cir. 2000) (explaining that protection for standard character registrations—formerly referred to as "typed" marks—extends to all depictions of the mark and is "not limited to the mark as it is used in commerce").

*Fit, Inc. v. Pleasanton Fitness, LLC*, 2013 WL 521784, at *5 (M.D. Fla. Feb. 11, 2013) ("In deciding similarity, the court must 'not look just at the typewritten and aural similarity of the marks, but how they are presented in the marketplace.'") (quoting *The Sports Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 962 (2d Cir. 1996)). As was made clear at trial, the relevant marketplace in this case consists of real estate agents in Florida looking (or recruited) to join a real estate brokerage company that provides services in connection with urban, residential properties in Florida. It is the use of the UNITED marks in this marketplace that matters. And, as discussed, that use is done by United Real Estate.[11] As such, the Court compares the similarity between the UNITED REAL ESTATE mark and the UNITED REALTY GROUP mark—including both the logo and textual forms of the respective marks.

Turning first to the relevant logs, the main similarity is the shared use of the word "United" in both:



Also, the subsequent descriptors in the marks—i.e., "Real Estate" and "Realty Group"—both appear below the word "United." But there are obvious differences as well. In United Real Estate's mark, the word "United" is not in all caps, whereas in URG's mark it is. The United Real Estate mark is in all blue text, whereas the URG mark displays three different colors.

---

[11] Conversely, United Country does not offer real estate brokerage services in connection with urban, residential properties in Florida. Additionally, the Court notes that United Country did not suggest, let alone present evidence, that United Real Estate franchises in Florida recruit prospective real estate agents using the standalone UNITED mark without reference to the UNITED REAL ESTATE mark, and so the Court's comparative analysis will be limited to the UNITED mark as it is specifically used in UNITED REAL ESTATE.

Finally, the United Real Estate mark displays two curved lines or arches underneath the word "United" that are not connected, whereas the URG mark displays an overarching, incomplete ellipse. In light of these differences, the Court finds that the mere incorporation of the word "United" in URG's logo does not render it sufficiently similar to United Real Estate's logo to support finding a likelihood of confusion. *See, e.g.*, *World Triathlon*, 2007 WL 2875456, at *5 ("The mere fact that both marks incorporate a form of the common term 'Ironman' does not render the marks sufficiently similar to establish likelihood of confusion."); *Freedom Sav. & Loan*, 757 F.2d at 1183 (holding "Freedom Realty" and "Freedom Savings and Loan" are not sufficiently similar); *Sun Banks*, 651 F.2d at 316 ("Sun Federal and Savings Loan Association" not confusingly similar to "Sun Banks"); *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 260 (5th Cir.1980) ("Domino's Pizza" not similar to "Domino sugar"), *cert. denied*, 449 U.S. 899 (1980); *Bell Laboratories, Inc. v. Colonial Prods., Inc.*, 644 F. Supp. 542, 547 (S.D. Fla. 1986) ("Final flip" and "Flip" marks for same product are "ultimately different and different sounding"); *In re Hearst Corp.*, 982 F.2d 493, 494 (Fed. Cir. 1992) ("Varga girl" and "Vargas" are "sufficiently different in sound, appearance, connotation, and commercial impression, to negate likelihood of confusion"); *Mr. Hero Sandwich Sys., Inc. v. Roman Meal Co.*, 781 F.2d 884, 888 (Fed. Cir. 1986) ("Romanburger" and "Roman" marks for food products "are not similar in appearance"); *Little Caesar Enterprises v. Pizza Caesar, Inc.*, 834 F.2d 568, 571 ("Pizza Caesar U.S.A." not similar to "Little Caesar's"); *Conde Nast Pubs., Inc. v. Miss. Quality, Inc.*, 507 F.2d 1404, 1407 (CCPA 1975) ("Country Vogues" and "Vogue" publications "do not look or sound alike"); *Pacquin-Lester Co. v. Charmaceuticals, Inc.*, 484 F.2d 1384 (CCPA 1973) ("Silk 'n' Satin" beauty and bath lotion and oil not similar to "Silk" face cream).

The same cannot be said when comparing the word marks UNITED REAL ESTATE and UNITED REALTY GROUP. Considering the overall impression created, both marks are obviously similar in sound and appearance. In both marks, the word "United" appears first and is followed by either "Real Estate" or "Realty," which are essentially synonymous terms; "realty" is defined by Merriam-Webster as "real estate."[12] The only meaningful difference between the marks, then, is that the URG mark contains the word "Group." But even Dr. Hoyer testified that the word "Group" is a descriptive term when used in connection with URG's services and would not help consumers distinguish between the marks. *See also In re Chatam Int'l Inc.*, 380 F.3d 1340, 1342-43 (Fed. Cir. 2004) (noting that descriptive or generic aspects of a mark are given less weight when comparing marks); *In re The Paint Prods. Co.*, 8 USPQ 2d 1863, *2 (T.T.A.B. 1998) (when entity designations such as "company" describe an applicant's business type, they do not function as a source identifier and must be disclaimed). Importantly, this similarity in sound and appearance with the UNITED REAL ESTATE word mark also applies to URG's logo. *See In re Viterra Inc.*, 671 F.3d 1358, 1366 (Fed. Cir. 2012) (recognizing that even in a "composite mark comprising a design and words, the verbal portion of the mark is the one most likely to indicate the origin of the goods to which it is affixed," as the "literal component of brand names likely will appear alone when used in text and will be spoken when requested by consumers."). In other words, whether potential consumers are exposed to the URG logo or the UNITED REALTY GROUP word mark, similarity to the UNITED REAL ESTATE word mark—whether as read or spoken—is implicated. This is especially so given that

---

[12] The Court also notes that the PTO rejected a third party application for the UNITED REALTY GROUP mark in connection with real estate brokerage services based on a likelihood of confusion. *See generally Brewing Co. v. Philip Morris Inc.*, 297 F. Supp. 1330, 1337 (N.D. Ga. 1968) ("While the various Patent Office decisions referred to are not binding upon this court, they are certainly entitled to the most respectful consideration because of the Patent Office's day-to-day expertise in adjudicating cases wherein the ultimate question decided is the question of 'likelihood of confusion' as that term is employed in various parts of the Lanham Act.").

URG, by its own admission, achieves most of its recruitment by word of mouth. Thus, although the Court does not find that the relevant logos themselves are meaningfully similar, the Court does find sufficient similarity between the URG mark—whether in logo or textual form—and the UNITED REAL ESTATE word mark so as to weigh this factor in favor of United Country.

### iii. Similarity of the Services

The third factor looks at whether the parties' services "are the kind that the public attributes to a single source." *Fla. Int'l U. Bd. of Trustees*, 830 F.3d at 1261 (quoting *Frehling Enters.*, 192 F.3d at 1338). The proper test is not whether the services can be readily distinguished, but rather whether the services "are so related in the minds of consumers that they get the sense that a single producer is likely to" offer both services. *Frehling Enters.*, 192 F.3d at 1338. The focus is on "the reasonable belief of the average consumer as to what the likely source of the goods [is]." *Id.*

United Country argues that this factor weighs in its favor because both it and URG offer real estate brokerage services. *See* ECF No. [150] at 34-35. Defendant URG counters that "such a broad-brush description does not satisfy the 'similar services' factor . . . ." ECF No. [149] at 33. Rather, according to URG, the real estate services in this case are different: "Plaintiff and United Real Estate sell franchises to real estate brokers. United Realty Group, on the other hand, only recruits real estate agents, it does not recruit brokers or sell franchises." *Id.* at 34. The glaring deficiency in URG's argument is that it completely ignores the undisputed fact that, in addition to recruiting brokers as potential franchisees, United Real Estate also recruits real estate agents to join its franchises. Thus, while none of the services offered by URG are franchise-related, the recruitment of agents by both URG and United Real Estate undoubtedly constitutes a significant overlap in services. As mentioned above, the relevant question is whether the parties'

services "are so related in the minds of consumers that they get the sense that a single producer is likely to" offer both services. *Frehling Enters.*, 192 F.3d at 1338. The Court finds that to be the case here, and therefore finds this factor to weigh in favor of United Country. *See, e.g.*, *Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat. Univ., Inc.*, 91 F. Supp. 3d 1265, 1278 (S.D. Fla. 2015) ("It is clear to the Court that a significant portion of FNU's student population is receiving a wholly different kind of education than that offered by FIU. However, it is also clear that FNU offers several degree programs that overlap with those offered by FIU. . . . [T]he Court finds that, despite the obvious differences in the educational models offered by the two parties, a reasonable consumer could conclude that the services provided by FIU and FNU are attributable to a single source."), *aff'd sub nom. Fla. Int'l Univ. Bd. of Trustees*, 830 F.3d 1242.

### iv. Similarity of the Channels of Trade and Customers

"The fourth factor takes into consideration where, how, and to whom the parties' products are sold." *Fla. Int'l U. Bd. of Trustees*, 830 F.3d at 1261. "Dissimilarities between the retail outlets for and the predominant customers of plaintiff's and defendant's goods [or services] lessen the possibility of confusion, mistake or deception." *Frehling*, 192 F.3d at 1339 (quoting *Amstar*, 615 F.2d at 262). While "the parties' outlets and customer bases need not be identical, some degree of overlap should be present" to weigh in favor of a likelihood of confusion. *Frehling*, 192 F.3d at 1339.

Similar to the similarity of services factor, United Country's argument that the fourth factor weighs in its favor is based on prospective real estate agents: "Both parties solicit agents by email advertisements and websites with information targeted at agents. . . . [There is] significant overlap in the relevant consumers between United Real Estate and Defendant for the services offered under the respective marks, and accordingly this factor weights in favor of

United [Country]."  ECF No. [150] at 35-36.  Defendant URG likewise points exclusively to the parties' respective consumer bases in arguing that this factor does not support finding a likelihood of confusion: "United Realty Group and Plaintiff serve completely different real estate consumers.  Plaintiff targets franchisees who are broker owners, while Plaintiff [sic] only employs real estate associates under its own brokerage license."  ECF No. [149] at 34.  The Court is in agreement with United Country on this factor.

Both United Real Estate and URG target agents.  And while United Real Estate also recruits brokers as potential franchisees, United Real Estate only had four franchises in Florida at the time of trial.  United Country has demonstrated that United Real Estate is an "agent-centric business[,]" whereby agents far outnumber broker-franchisees and generate substantial revenue. ECF No. [150] at 35.  As an example, Dan Duffy, the CEO of United Real Estate Holdings, LLC (which owns and operates United Country and United Real Estate), testified that when Ms. Diaz de Villegas first joined United Real Estate as a broker-franchisee, she employed more than 150 agents.  *See* ECF No. [145] at 285-86.  As such, for both United Real Estate and URG, it is the case that agents constitute the *predominant* consumer.  *Cf. Fla. Int'l Univ. Bd. of Trustees*, 91 F. Supp. 3d at 1279 ("Because it is clear that the vast majority of customers of FNU's services are highly dissimilar from FIU's customer base, the possibility of mistake or confusion is lessened in this case."); *Amstar*, 615 F.2d at 262 (finding that the likelihood of confusion is dampened where there are "substantial dissimilarities between the predominant purchasers of plaintiff's and defendant's products").  Finally, the Court notes the considerable similarity between the channels of trade used by United Real Estate and URG.  As United Country points out, both companies utilize email advertisements and websites targeted specifically at prospective agents.  For these reasons, the Court finds that this factor weighs in favor of United Country.

### v. Similarity of Advertising Media

The fifth factor requires a comparison of "the parties' advertisements and the audiences they reach." *Fla. Int'l U. Bd. of Trustees*, 830 F.3d at 1262. "The greater the similarity, the greater the likelihood of confusion." *Id.* (quoting *Sovereign Military*, 809 F.3d at 1188). Identity of advertising methods is not required; rather, "the standard is whether there is likely to be significant enough overlap in the [audience of the advertisements] that a possibility of confusion could result." *Id.* (quoting *Frehling Enters.*, 192 F.3d at 1340) (alteration in original).

The Court finds that there is significant enough overlap in the audience of some forms of United Real Estate's and URG's respective advertisements that a possibility of confusion could result, but with one caveat. Both United Real Estate and URG have advertised in the same real estate publication, and both parties send email advertisements to licensed agents based on lists provided by third party vendors. *See, e.g.*, *Fla. Int'l U. Bd. of Trustees*, 830 F.3d at 1263 (agreeing with the district court's finding that the parties' advertising on the same radio station served as "sufficient to create some likelihood that the same consumers would be exposed to both schools' marks"). Importantly, with respect to the latter, the Court notes that both companies' email advertisements tout a 100% commission model. However, there is one substantial difference between the advertising methods of United Real Estate and URG: the bulk of URG's agency referrals are effectuated through word of mouth—particularly by current URG agents. United Country did not present any evidence that United Real Estate similarly relies on agency referrals through word of mouth by current agents. The difference is by no means insignificant, as URG currently employs approximately 2,000 agents. In the Court's view, this difference tends to reduce the overall likelihood of confusion. Presumably, current agents of URG are not confused as to what companies URG may or may not be affiliated with, and so any

word of mouth done by them on URG's behalf is unlikely to carry with it such confusion—especially given the level of sophistication of real estate agents generally. *See, e.g.*, *Kensington Partners v. Cordillera Ranch, Ltd.*, 1998 WL 1782540, at *8 (W.D. Tex. June 16, 1998) ("Also, Mr. Engle testified that word of mouth advertising is considered to be Kensington's most important category of marketing for Cordillera. It is highly unlikely that word of mouth advertising would create any confusion."). On balance, the Court finds this factor to weigh in favor of United Country, though only slightly so, given that a critical form of URG's advertising—which appears unmatched by United Real Estate—carries no risk of confusion.

### vi.     United Realty Group's Intent

The sixth factor looks at the defendant's intent in adopting its mark. "If it can be shown that a defendant adopted a plaintiff's mark with the intention of deriving a benefit from the plaintiff's business reputation, this fact alone may be enough to justify the inference that there is confusing similarity." *Fla. Int'l U. Bd. of Trustees*, 830 F.3d at 1263 (quoting *Frehling Enters.*, 192 F.3d at 1340). United Country concedes that although URG began using its UNITED REALTY GROUP mark in connection with real estate brokerage services in 2005, it was unaware of United Country or any of its affiliates until July of 2014, when it received the initial cease and desist letter. *See* ECF No. [150] at 37. As such, there is no evidence in the record that URG adopted its mark in order to capitalize on the reputation of United Country or any of its affiliates, and this factor therefore weighs in favor of URG.

### vii.    Actual Confusion

Finally, as mentioned, evidence of actual confusion by actual or potential consumers—though not necessary to find a likelihood of confusion—is the best evidence of a likelihood of confusion. *Fla. Int'l U. Bd. of Trustees*, 830 F.3d at 1264. "[T]he quantum of evidence needed

to show actual confusion is relatively small." *Id.* (quoting *Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3d 931, 937 (11th Cir. 2010)) (alteration in original). That said, "a sole, *de minimis* instance of consumer confusion is not enough to militate in favor of [] finding a likelihood of confusion." *Fla. Int'l Univ. Bd. of Trustees*, 91 F. Supp. 3d at 1283. "In assessing the weight of evidence of actual confusion, we must consider <u>who</u> was confused and <u>how</u> they were confused: 'Short-lived confusion or confusion of individuals casually acquainted with a business is worthy of little weight, ... while confusion of actual customers of a business is worthy of substantial weight.'" *Fla. Int'l U. Bd. of Trustees*, 830 F.3d at 1264 (quoting *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1167 (11th Cir. 1982)) (emphasis in original).

United Country presented evidence of four instances of alleged actual consumer confusion. The first was testimony from Mr. Giese that while at a national conference he was approached by Ms. Hansen, a broker and owner of her own real estate brokerage company in Florida, who expressed to him her belief that United Real Estate was operating in Florida's real estate brokerage market before it actually was. The Court finds that this evidence is entitled to minimal weight. To begin with, the evidence depends on a degree of speculation, as neither Mr. Giese's nor Ms. Hansen's testimony demonstrated that Ms. Hansen ever referred explicitly to a third party company, let alone URG specifically. Aside from that, and more importantly, Ms. Hansen was not an actual or potential customer of United Real Estate. Rather, as Mr. Giese testified, Ms. Hansen was a fellow panel member and speaker at the national conference.[13] *See Fla. Int'l U. Bd. of Trustees*, 830 F.3d at 1264; *Aronowitz v. Health-Chem Corp.*, 513 F.3d 1229, 1239-40 (11th Cir. 2008) ("With regard to actual confusion, we have specifically accorded

---

[13] There was no indication that Ms. Hansen was interested in purchasing a United Real Estate franchise or that United Real Estate made efforts to recruit her as a franchisee or agent.

'substantial weight' to evidence that actual customers were confused by the use of a mark as opposed to other categories of people.").

The second instance of claimed confusion was a form submitted through one of United Real Estate's websites in which a real estate agent, Mr. Hyslop, expressed his interest in joining United Real Estate "as an agent" after seeing "*United Realty's* adverts and attractive commission schedule." Pl. Exh. 51 (emphasis added). Of course, at the time Mr. Hyslop submitted the online form, United Real Estate had yet to open any offices in Florida or begin to advertise its commission model to prospective agents. The Court finds that Mr. Hyslop's online form is entitled to considerable weight, as it specifically references a third party company named "United Realty" and Mr. Hyslop was himself a potential customer of United Real Estate who was actively seeking with it an agency relationship. *See Fla. Int'l U. Bd. of Trustees*, 830 F.3d at 1264 (acknowledging that a high school student who sent an email to Florida National University inquiring about Florida International University was as "an actual prospective student who was actively looking at potential college options" and therefore "undoubtedly" served as "an 'actual consumer' for purposes of the likelihood of confusion analysis").

The third instance of claimed confusion involved Ms. Diaz de Villegas, who forwarded a marketing email she received from URG that advertised URG's 100% commission model. A little over two years after receiving the email, while Ms. Diaz de Villegas was negotiating with United Real Estate for the purchase of a franchise in Florida, Ms. Diaz de Villegas forwarded the email to United Real Estate. Ms. Diaz de Villegas' email to United Real Estate literally reads: "I'm confused? These people are advertising like crazy ! Is this you?" Pl. Exh. 52. On the witness stand, Ms. Diaz de Villegas testified that she was confused as to whether United Real Estate and URG were affiliated based on the contents of URG's marketing email. The Court

finds that Ms. Diaz de Villegas' email to United Real Estate is entitled to some weight given that it expresses confusion between United Real Estate and URG by a potential—and later, an actual—customer of United Real Estate who was actively seeking to purchase a franchise.[14] *See Fla. Int'l U. Bd. of Trustees*, 830 F.3d at 1264. Of course, Ms. Diaz de Villegas' initial confusion was resolved soon after she forwarded the URG marketing email to United Real Estate through her subsequent negotiation talks with Mr. Pedrero, and Ms. Diaz de Villegas ultimately purchased a United Real Estate franchise. Relatedly, Ms. Diaz de Villegas, as a prospective and eventual franchisee, was not the kind of potential consumer contemplated in this case. As United Country aptly describes, "the core consumer for Defendant and United Real Estate are *agents* who enjoy a 100% commission and flat transaction fee model." ECF No. [150] at 6-7 (emphasis added). The Court finds these points also worthy of consideration.[15]

Finally, the fourth instance of claimed confusion was a report Mr. Pedrero received from United Real Estate's sales director in south Florida in early 2016—merely days before this lawsuit was filed—wherein the sales director expressed *his* perception that certain prospective franchisees he had been in contact with were confused between United Real Estate and "the locally based real estate company with a similar name." *See* Pl. Exh. 53. For example, the sales director stated to Mr. Pedrero that he "sense[s]" a prospective franchisee "may think that he is speaking with Florida based URE." *Id.* The Court declines to credit this report as it directly

---

[14] Defendant URG attempted to impeach Ms. Diaz de Villegas by pointing out, *inter alia*, that United Real Estate waived for Ms. Diaz de Villegas a substantial amount of initial franchise fees and that Ms. Diaz de Villegas was required by one of her franchise agreements to cooperate with United Real Estate in any litigation in which it becomes involved. *See also* ECF No. [149] at 38. The Court was not persuaded. Ms. Diaz de Villegas forwarded to United Real Estate the URG marketing email before actually purchasing a franchise or entering into any agreement with United Real Estate, and the Court otherwise found her testimony at trial to be credible.

[15] To illustrate the point further, a prospective United Real Estate franchisee, no matter how confused as to United Real Estate and URG, could never actually purchase a franchise from URG under the mistaken belief that URG is, or is affiliated with, United Real Estate. This is because URG does not sell franchises nor does it recruit brokers.

reflects the perception of the sales director, who did not testify at trial. *See Fla. Int'l U. Bd. of Trustees*, 830 F.3d at 1264-65 ("FIU also provided hearsay testimony from its Rule 30(b)(6) designee that some of its employees were 'confused' by FNU's new name. . . . The [district] court did not credit FIU's hearsay evidence regarding employee confusion . . . . [T]he district court was well within its right to disregard FIU's hearsay evidence of confusion among its employees, which was no more than references by FIU's Rule 30(b)(6) representative to ambiguous statements by unidentified employees at some point in the past."); *Holiday Inns, Inc. v. Holiday Out In Am.*, 351 F. Supp. 537, 541-42 (S.D. Fla. 1972) ("The brevity of the letters, the fact that the writers were not called to testify and thus were unavailable for cross-examination, the unsubstantiated legitimacy of the letters, and the absence of evidence which corroborates the actual confusion they purport to show, all militate against such an interpretation of these letters. Without more, it is rank speculation to assume that defendants' advertising or defendants' use of the mark caused the letter writers or unnamed third parties to believe there to be a business association between plaintiff and defendants."), *aff'd*, 481 F.2d 445 (5th Cir. 1973).

In sum, the Court was presented with evidence of two legitimate instances of actual confusion: (1) a form submitted online by a prospective real estate agent (the "core consumer" in this case); and (2) an email sent from a prospective franchisee during negotiations that ultimately led to her becoming an actual franchisee. But for reasons alluded to above, the Court does not afford these instances equal weight. Mr. Hyslop's online form is certainly United Country's best evidence of actual confusion. Ms. Diaz de Villegas' email, on the other hand, has more limited probative value, as she was not a prospective real estate agent. Ms. Diaz de Villegas' dealings with United Real Estate as a prospective and eventual franchisee dispelled what ultimately proved to be "short lived confusion" on her part. *Fla. Int'l U. Bd. of Trustees*, 830 F.3d at 1264

(quoting *Safeway Stores*, 675 F.2d at 1167); *see also Vital Pharm., Inc. v. Am. Body Bldg. Prods., LLC*, 511 F. Supp. 2d 1303, 1318 (S.D. Fla. 2007) ("The Eleventh Circuit has not embraced [the] principle [of initial interest confusion], and I find it unpersuasive. When the bottom line is sales of a particular product, initial confusion prior to and concluding before the point of purchase does not seem dispositive in a likelihood of confusion analysis."); *Suntree Techs., Inc. v. EcoSense Int'l, Inc.*, 802 F. Supp. 2d 1273, 1283 (M.D. Fla. 2011) ("Suntree alleges initial interest confusion, which is not actionable confusion in the Eleventh Circuit."). Moreover, the nature of the franchise transaction that followed "requires that the purchasers of the services … be sophisticated consumers." *See Fla. Int'l U. Bd. of Trustees*, 830 F.3d at 1265 (discounting the probative value of a letter purporting to show actual confusion as to an affiliation of two universities based in part on "the nature of the [universities'] business").

Overall, viewed in totality, the Court finds these instances of confusion insufficient to weigh in favor of finding a likelihood of confusion. Mr. Hyslop's online form, by itself, serves as "a sole, *de minimis* instance of consumer confusion [that] is not enough to militate in favor of [] finding a likelihood of confusion." *Fla. Int'l Univ. Bd. of Trustees*, 91 F. Supp. 3d at 1283; *see also See Fla. Int'l U. Bd. of Trustees*, 830 F.3d at 1265 ("[W]ith only a single probative instance of consumer confusion in the years since FNU's name change, the district court reasonably decided that this factor did not weigh in favor of a likelihood of confusion."). And Ms. Diaz de Villegas' email does not tip the scale. *See, e.g., Hornady Mfg. Co., Inc. v. Doubletap, Inc.*, 746 F.3d 995, 1004-05 (10th Cir. 2014) (proffered evidence of actual confusion involving only a handful of instances of confusion was *de minimis*). Thus, this factor weighs in favor of URG.

### viii. Balancing the Likelihood of Confusion Factors

After evaluating all of the likelihood-of-confusion factors in light of the relevant evidence and arguments, the Court finds that United Country has not established that URG's mark creates a likelihood of confusion. The Court recognizes that this is a close case. Of the seven factors, four weigh in favor of finding a likelihood of confusion: similarity of the marks, similarity of the services, similarity of trade channels and customers, and similarity of advertising media. Importantly, however, "the two most important factors—evidence of actual confusion and the strength of the mark—do not." *See Fla. Int'l U. Bd. of Trustees*, 830 F.3d at 1265. United Country's evidence of actual confusion is essentially *de minimis*, and the crowded field of real estate businesses in Florida using the word "United" in their company names weakens the overall strength of the UNITED marks.

Above all else, the heightened burden applicable in this case due to the sophisticated nature of the relevant consumer base substantially undercuts finding a likelihood of confusion. Real estate agents must go through significant training and testing before obtaining a license, and they must complete continuing educational requirements to retain the license. In addition, the employment nature of the transaction contemplated in this case ensures that even greater attention will be paid during the time any alleged confusion might otherwise manifest into actual harm. As a primary example, prospective real estate agents looking to join URG usually have direct contact with a URG representative at an interview—conducted either by phone or in person—and must complete paperwork before officially becoming a URG agent. *See EMSL Analytical, Inc. v. Testamerica Analytical Testing Corp.*, 2006 WL 892718, at *8 (D.N.J. Apr. 4, 2006) (in analyzing sophistication of customers as a separate likelihood-of-confusion factor, emphasizing that the relevant consumer group included "hygienists, [] consultants, environmental specialists, etc." and that "the sale of the services requires direct and repeated

personal contact with customers") (citing *Accuride Int'l., Inc. v. Accuride Corp.*, 871 F.2d 1531, 1537 (9th Cir. 1989)); *see also Accuride Int'l.*, 871 F.2d at 1537 (finding that direct sales by knowledgeable salespersons weighed heavily against finding a likelihood of confusion). For these reasons, real estate agents (and real estate brokers for that matter) are less likely to be easily and/or meaningfully confused by similar-sounding real estate brokerage companies. Thus, it is unlikely that a prospective real estate agent would inadvertently choose to represent a real estate brokerage company it never actually intended to. *See Blue Bell Bio-Med. v. Cin-Bad, Inc.*, 864 F.2d 1253, 1260 (5th Cir. 1989) ("[T]he care with which hospitals purchase medical carts, including field testing of any unfamiliar product, makes it unlikely that a facility might inadvertently pick up a brand they did not mean to purchase.").

As one court has recognized, "the typical client of a real estate brokerage agency is not an expert in the purchase and sale of real estate or in real estate franchise relationships." *RE/MAX Int'l, Inc. v. Trendsetter Realty, LLC*, 655 F. Supp. 2d 679, 708 (S.D. Tex. 2009). Rather, "the ordinary consumer of real estate brokerage services. . . . is likely to be a typical buyer exercising ordinary caution." *Id.* (citation and internal quotation marks omitted); *see also Vesta Corp. v. Vesta Mgmt. Servs., LLC*, 2016 WL 8710440, at *12 (S.D. Tex. Sept. 30, 2016) ("So too here, the average renter looking for an apartment is unlikely to understand the relationship between the two parties to this lawsuit.") (citing *RE/MAX Intern*, 655 F. Supp. 2d at 707-708). But in this case, unlike the ordinary consumer of real estate brokerage services—such as renters, buyers, and sellers of real estate—a real estate agent is exactly the kind of person who is likely to understand the relationship between the parties in this case.

Having failed to establish that URG's mark creates a likelihood of confusion, United Country's trademark infringement claims under 15 U.S.C. §§ 1114, 1125(a) must fail. Defendant URG is therefore entitled to judgment on both Counts I and II of the Complaint.[16]

## V.    CONCLUSION

For the foregoing reasons, the Court finds that Plaintiff has failed to meet its burden of establishing a likelihood of confusion so as to prevail on its trademark infringement claims under the Lanham Act, and judgment must therefore be entered in favor of Defendant.  Pursuant to Rule 58 of the Federal Rules of Civil Procedure, the Court will enter judgment for Defendant by separate order.

**DONE AND ORDERED** in Miami, Florida, this 29th day of September, 2017.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:
Counsel of Record

---

[16] As a final note, URG's argument that United Country's claims are barred by laches fails.  *See generally Citibank, N.A. v. Citibanc Group, Inc.*, 724 F.2d 1540, 1546 (11th Cir. 1984) (in order to successfully assert a laches defense a defendant must show an inexcusable delay in asserting a right or claim that ultimately causes the defendant undue prejudice).  United Real Estate entered the Florida market in 2013, and United Country filed suit in January of 2016.  Although URG presented evidence that United Country had a presence in Florida long before—namely, through its United Country brand that focuses on country and vacation properties—there was no evidence that United Country, like URG, dealt with urban, residential real estate.  In other words, United Country had not "expanded into the [alleged] infringer's territory such that an action [could] be maintained" until 2013, when United Real Estate entered the relevant territory and market.  *Id.* (explaining that in a trademark case, "the plaintiff's rights must be protectable") (citing *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358 (2d Cir. 1959)).  Thus, on the facts of this case, the Court does not find that United Country unreasonably and inexcusably delayed in bringing its trademark infringement claims against URG.